**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

WATERS EDGE LIVING, LLC, etc.,
et al.,

   Plaintiffs,

v.           CASE NO.  4:06cv334-RH/WCS

RSUI INDEMNITY COMPANY, etc.,
et al.,

   Defendants.

_____/


**ORDER DENYING MOTION TO DISMISS,
REQUIRING JOINDER OF INDISPENSABLE PARTIES,
AND DENYING MOTIONS FOR DISBURSEMENT OF FUNDS**


  This is a dispute between two sets of insureds over insurance proceeds

admittedly payable as a result of losses incurred in Hurricane Katrina.  By

agreement of the parties, a portion of the disputed proceeds are being held in an

account subject to disbursement only upon order of this court.  The insurer has

unilaterally deposited additional proceeds to the same account.  Pending is a

motion to dismiss for lack of personal jurisdiction, improper venue, failure to state

a claim, and failure to join indispensable parties.  Also pending are motions for

disbursement of proceeds held in the account.  I deny the motion to dismiss for

lack of personal jurisdiction, improper venue, or failure to state a claim.  I hold that

there are necessary parties who have not been joined; I order their joinder.  I deny

all motions for disbursement of funds without prejudice to renewal if an

appropriate interpleader claim is not filed.

# I
# Background

The May Trust ("the Trust") holds a controlling interest in several entities

that own or manage commercial and residential real estate on a substantial scale.

Among the entities are American Realty Investors, Inc. ("American Realty"),

owned 76.9% by the Trust; Transcontinental Realty Investors, Inc.

("Transcontinental"), owned 82% by American Realty; Basic Capital Management,

Inc. ("Basic Capital"), owned 100% by the Trust; Realty Advisors, Inc., owned

100% by the Trust; defendant Prime Income Asset Management Co., Inc.

("Prime"), owned 80% by Realty Advisors; and Prime Income Asset Management,

LLC ("Prime LLC") owned 100% by Prime.[1]

American Realty and Transcontinental own property throughout the United

---

[1] This information is taken primarily from the public filings of
Transcontinental and American Realty as included in this record.  The percentages
are as of December 31, 2005; the record gives no reason to believe the percentages
were different at different relevant times.  The information is summarized in
Stephen E. Celec's affidavit and its attached chart.

States, including in Florida.  Neither American Realty nor Transcontinental has

employees.  Instead, from July 1, 2003, to September 30, 2003, Prime managed the

day to day affairs of both American Realty and Transcontinental.  Prime LLC took

over that role as of October 1, 2003.  Thus Prime (from July through September

2003) and Prime LLC (since then) have managed properties nationwide, including

substantial holdings in Florida.  Basic Capital may have had the same role for

American Realty and Transcontinental prior to July 1, 2003.

From 2002 to 2005, Antoine Boulos, of Tallahassee, Florida, and a business

associate (collectively "Boulos"), through controlled entities, purchased 16

apartment complexes in Florida from entities affiliated with the Trust.  Jim Fox

represented the selling entities.  Prior to July 1, 2003, Mr. Fox apparently was an

employee of Basic Capital.  From July 1, 2003, to September 30, 2003, Mr. Fox

apparently was an employee of Prime.  Since October 1, 2003, Mr. Fox apparently

has been an employee of Prime LLC.[2]

In 2005 Mr. Fox approached Boulos about the possible sale of the Waters

Edge apartment complex in Gulfport, Mississippi, which was then owned by a

Trust affiliate.  The parties negotiated a sale.  The negotiations occurred partly

---

[2] The record does not specifically indicate that Mr. Fox was an employee of
these entities.  This is a fair inference, however, from his role in the transactions
and the role of these entities with respect to projects owned by Trust affiliates.

through telephone calls between Mr. Fox in Texas and Mr. Boulos in Florida. An impediment developed, however, when Boulos was unable to find insurance at a premium deemed reasonable. Mr. Fox offered, and Boulos agreed, to resolve this difficulty by having this project retained on the master policy obtained by Prime (not Prime LLC) on this project and others.

Boulos formed plaintiffs Waters Edge Living LLC and Waters Edge JW, LLC (collectively "plaintiffs") to effect the purchase. The sale closed through the mails, with plaintiffs signing closing documents in Florida and the seller signing closing documents in Texas. Plaintiffs paid at closing a prorated share of the applicable insurance premiums, and plaintiffs and their mortgagees were added to the policy.

Later that year Hurricane Katrina destroyed the Waters Edge complex, causing damage of more than $33 million, not including any increased cost of rebuilding to upgraded codes. It is undisputed that plaintiffs are entitled to recover under the insurance coverage obtained by Prime. The amount of loss, other than for code upgrades, also apparently is undisputed. The rub is that the combined limit of Prime's coverage was $100 million applicable not only to the Waters Edge complex but to other properties as well. The combined loss to all of the covered properties caused by Hurricane Katrina apparently exceeded $100 million by a

substantial margin. Whether plaintiffs are entitled to full payment of their losses (as they contend) or only a pro rata or other portion (as Prime contends) is disputed.

The $100 million in total coverage consisted of two layers of $10 million each and an additional layer of $80 million provided by defendant RSUI Indemnity Company ("RSUI"). From the underlying layers, plaintiffs received $1.9 million; those layers are not at issue here. Plaintiffs demanded payment of its remaining damages from RSUI. When payment was not immediately forthcoming, plaintiffs filed this action against RSUI and Prime. RSUI promptly tendered separate checks for the agreed losses from physical damage (not including code upgrade losses) and lost rentals. The physical damage check, in the amount of just under $30 million, was payable jointly to Prime, plaintiffs, plaintiffs' mortgagees (Hancock Bank of Florida ("Hancock") and Trustmark National Bank ("Trustmark")), and the adjuster who determined the amount of damage (The Baldwin Company, Inc. ("Baldwin")). The check for lost rentals, in the amount of just over $2 million, was payable to Prime, plaintiffs, and Baldwin.

Plaintiffs demanded that Prime endorse the checks over to plaintiffs. Prime refused. Plaintiffs moved for a preliminary injunction requiring Prime to endorse the checks. Before the motion was heard, the parties reached an agreement for

retention of the proceeds of the checks in a stand alone investment account ("the Escrow Account") under the control of RSUI's attorneys.  An order implementing the agreement provided, "No funds shall be withdrawn from the account except as expressly approved by order of this court."  Order of July 31, 2006 (document 14) at 3 ¶1.

RSUI determined that total Hurricane Katrina losses to properties insured under the policy at issue would exceed $100 million by a substantial margin and deposited an additional $17 million, apparently the remainder of its $80 million coverage, into the Escrow Account.

## II
## Summary of Pending Motions

Prime has moved to dismiss for lack of personal jurisdiction, improper venue, failure to state a claim, and failure to join indispensable parties (the mortgagees).

Prime also has moved for an order requiring return to RSUI of the additional funds deposited to the Escrow Account, over and above the amounts deposited to that account pursuant to the parties' agreement.  Prime asserts RSUI will be obligated immediately to pay the funds over to other insureds.  Plaintiffs oppose the motion, asserting the other insureds are affiliated with Prime and thus should have lower priority in the funds than plaintiffs, to whom Prime had a contractual

obligation to maintain adequate coverage.  Plaintiffs assert that when code upgrade damages are included, plaintiffs' losses will exceed the funds now in the account, and that any payment of the newly deposited funds to Prime would improperly deprive plaintiffs of those funds.

Plaintiffs have moved for an order requiring disbursement from the Escrow Account of more than $12 million due the mortgagees.  Prime opposes the motion, asserting that because covered losses exceed RSUI's limits, plaintiffs ultimately may not be entitled to recover this much from the Escrow Account.

Baldwin (the adjuster) is not a party to this action but has moved for payment of its fees from the Escrow Account.  Plaintiffs oppose the motion, asserting that funds should not be paid from the account to Baldwin until funds also are paid from the account for the losses Baldwin adjusted—that is, for plaintiffs' losses.

## III
## Personal Jurisdiction

"A federal district court sitting in diversity may exercise personal jurisdiction to the extent authorized by the law of the state in which it sits and to the extent allowed under the Constitution."  *Meier ex rel. Meier v. Sun Intern. Hotels, Ltd.*, 288 F.3d 1264, 1269 (11th Cir. 2002).  "The court must determine whether the . . . Defendants' activities satisfy the Florida long-arm statute and, if

satisfied, whether the extension jurisdiction comports with the due process requirements of the Fourteenth Amendment." *Id.* "There are two types of personal jurisdiction: specific and general." *Madara v. Hall*, 916 F.2d 1510, 1516 n.7 (11th Cir. 1990). "Specific personal jurisdiction is founded on a party's contacts with the forum state that are related to the cause of action. General personal jurisdiction arises from a party's contacts with the forum state that are unrelated to the litigation." *Id.*

In the case at bar Prime is subject to both specific and general personal jurisdiction in Florida. For three months in 2003, Prime itself provided the workforce for corporations with major operations in Florida. Since then, Prime's wholly owned limited liability company has done so, at least in substantial part through the same management employee, Mr. Fox, who previously performed the same functions for Prime itself. As part of the substantial Florida operations, Mr. Fox solicited a relationship with Boulos, leading to the sale of 16 apartment complexes in Florida and, eventually, to the sale of the Waters Edge complex in Mississippi that is now at issue. Mr. Fox knowingly communicated with Mr. Boulos, while Mr. Boulos was in Florida, with respect to the Waters Edge transaction, and ultimately entered an agreement on behalf of Prime for provision to plaintiffs of the insurance coverage now at issue. In short, Prime itself and

Prime's affiliates solicited the transaction now at issue through communications

sent into Florida, and Prime and its affiliates have been and are engaged in

substantial and not isolated activities in Florida.  Prime is properly subject to

personal jurisdiction in Florida.

## IV
## Venue

Venue in a case in which jurisdiction is founded solely on diversity of

citizenship is proper in a district "where any defendant resides, if all defendants

reside in the same State," 28 U.S.C. §1391(a)(1), or where "a substantial part of the

events giving rise to the claim occurred."  28 U.S.C. §1391(a)(2).  Both of these

provisions support venue here.

First, a corporate defendant is "deemed to reside in any judicial district in

which it is subject to personal jurisdiction at the time the action is commenced."

28 U.S.C. §1391(c).  Prime contests personal jurisdiction but apparently concedes

that, if it is subject to personal jurisdiction, it is a resident of Florida.  Neither

Prime nor RSUI has challenged the assertion that RSUI is subject to personal

jurisdiction in Florida and thus resides in the state for venue purposes.  As set forth

above, Prime is subject to personal jurisdiction in Florida, so both defendants

reside in Florida, and venue is proper under §1391(a)(1).[3]

Second, a substantial part of the events giving rise to the claim occurred in this district.  Prime or Prime LLC solicited plaintiffs through communications into this district to purchase the Waters Edge apartments; Prime communicated into this district an offer to provide insurance for the project; plaintiffs signed the closing documents and agreement for insurance coverage here; and payment of the insurance proceeds in at least some amount eventually was (and is) due to plaintiffs here.  To be sure, not all of the events giving rise to the claim occurred here—the sellers' representatives were in Texas and signed the closing documents and insurance agreement there (apparently after plaintiffs signed them in Florida), and the damaged property is in Mississippi.  But §1391(a)(2) does not limit venue to the place where all or most of the events giving rise to the claim occurred; the statute places venue in every district where a "substantial part" of the events occurred.  A substantial part of the events at issue occurred here.  Venue is proper.

## V
## Failure To State a Claim

The test of the sufficiency of a complaint is not whether it has alleged with precision everything the plaintiff will have to prove in order to prevail at trial.

---

[3] Prime criticizes plaintiffs' pleading of venue, saying the complaint does not allege that RSUI is a resident of Florida.  Prime does not, however, deny that RSUI is in fact a resident of Florida.

Instead, a motion to dismiss for failure to state a claim should be granted only if it appears to a certainty that the plaintiff would be unable to recover under any set of facts that could be proved in support of the complaint. *See, e.g., Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S. Ct. 99, 102, 2 L. Ed. 2d 80 (1957)*; Hunnings v. Texaco, Inc.*, 29 F.3d 1480, 1484 (11th Cir. 1994); *see also Swierkiewicz v. Sorema*, 534 U.S. 506, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002) (rejecting assertion that complaint could be dismissed for failure to plead all elements of a Title VII prima facie case and noting that a complaint need only include a short and plain statement of the claim; defendants may obtain further details through discovery); *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 168-69, 113 S. Ct. 1160, 1163, 122 L. Ed. 2d 517 (1993) (reversing dismissal of complaint for failure to plead with sufficient detail and adding, "federal courts and litigants must rely on summary judgment and control of discovery to weed out unmeritorious claims sooner rather than later").

In support of its motion to dismiss, Prime argues that plaintiffs are entitled under the parties' agreement only to payment of an appropriate share of the available coverage, not to full payment of plaintiffs' losses. Even if one could conclude from the face of the agreement itself, without consideration of the circumstances that led to entry into the agreement or other parol evidence, that

Prime's construction was correct—not an obvious proposition—Prime still would

not be entitled to dismissal of this complaint.  Plaintiffs have not been paid, and

they surely have stated a claim for payment of *some* amount.  A complaint is not

subject to dismissal on the ground that a plaintiff claims higher damages than the

plaintiff will be able to recover.

It cannot be said to a certainty that plaintiffs will be unable to recover under

any set of facts that could be proved in support of this complaint.  The complaint

thus states a claim on which relief may be granted.

## VI
## Indispensable Parties

Prime asserts that the mortgagees, Hancock and Trustmark, are

indispensable parties as defined in Federal Rule of Civil Procedure 19.  Prime

makes no such claim with respect to the adjuster, Baldwin.

There is no fixed rule governing the need to join mortgagees in the insurance

context.  The determination is, instead, fact-intensive.  *See, e.g.*, 7 WRIGHT,

MILLER & KANE, FEDERAL PRACTICE & PROCEDURE, CIVIL 3D §1619, at 290-303

(2001) ("The question of joinder of parties under Rule 19 has arisen in a variety of

cases involving insurance claims that defy generalization."); *Provident Tradesmens*

*Bank & Trust Co. v. Patterson*, 390 U.S. 102, 118, 88 S. Ct. 733, 742, 19 L. Ed. 2d

1936 (1968) ("Whether a person is 'indispensable,' that is, whether a particular

lawsuit must be dismissed in the absence of that person, can only be determined in

the context of particular litigation.").

The standards that govern the fact intensive inquiry are set forth in Rule 19

itself:

> A person who is subject to service of process and whose joinder
> will not deprive the court of jurisdiction over the subject matter of the
> action shall be joined as a party in the action if (1) *in the person's*
> *absence complete relief cannot be accorded among those already*
> *parties, or* (2) the person claims an interest relating to the subject of
> the action and is so situated that the disposition of the action in the
> person's absence may (i) *as a practical matter impair or impede the*
> *person's ability to protect that interest or* (ii) *leave any of the persons*
> *already parties subject to a substantial risk of incurring double,*
> *multiple, or otherwise inconsistent obligations* by reason of the
> claimed interest. If the person has not been so joined, the court shall
> order that the person be made a party. If the person should join as a
> plaintiff but refuses to do so, the person may be made a defendant, or,
> in a proper case, an involuntary plaintiff. If the joined party objects to
> venue and joinder of that party would render the venue of the action
> improper, that party shall be dismissed from the action.

Fed. R. Civ. P. 19(a) (emphasis added).

In the case at bar, all three of the italicized provisions cut in favor of

requiring joinder of the mortgagees.  They are most easily addressed in a sequence

different from that set forth in the rule.

First, the mortgagees are so situated that disposition of this action in their

absence may as a practical matter impair their ability to protect their interests.  The

insurance proceeds apparently will be insufficient to pay all claims.  Plaintiffs

assert the proceeds at least will be sufficient to pay the mortgagees, but Prime disputes this, and this record does not resolve the issue. If a determination is made in this action that the share of available funds properly payable on account of Waters Edge losses is less than the amount due on the mortgages, there is a risk that the mortgagees will be unable to recover the full amount they are owed. This record does not establish that these mortgagees' interests are fully protected from any other source.

Second, disposition of this action in the mortgagees' absence could subject RSUI to a substantial risk of incurring double liability. If a determination is made in this action that the share of available funds properly payable on account of Waters Edge losses is less than the amount due on the mortgages and RSUI pays its limits in accordance with that determination, the mortgagees could file their own actions seeking payment. This record is insufficient to allow a determination of whether the mortgagees could or could not pursue a direct action, but the risk is there. Indeed, it presumably was to avoid this risk that RSUI included the mortgagees on the check it originally tendered in payment of Waters Edge losses.

Finally, in the mortgagees' absence, complete relief cannot be afforded, if a determination is made that the share of available funds properly payable on account of Waters Edge losses is less than the amount due on the mortgages.

The weight of authority fully supports this analysis. Illustrative is *Boyleston v. Nationwide Mutual Fire Insurance Co.*, 246 F. Supp. 463 (E.D.S.C. 1965), in which the court required joinder of an insured's mortgagee. The court said the mortgagee and mortgagor had a "common interest in the proceeds alleged to be due under defendant [insurer's] policy, and that [mortgagee] should be joined as a party to th[e] action, inasmuch as complete relief between the present parties cannot be had herein without the joining of [the mortgagee]. Otherwise defendant will be exposed to double liability." *Id.* at 463-64.

*Smith v. State Farm Fire and Casualty Co.*, 633 F.2d 401 (5th Cir. 1980), is not to the contrary. There two insureds sued an insurer to recover for losses to insured property. One of the insureds, whose interest was ultimately valued at $1,850, was the debtor in a separate bankruptcy proceeding. The trustee was not joined as a party to the insurance case. No claim was made that the trustee should have been joined until midway through the trial at the earliest. There was a potential dispute between the insured's successor and the trustee over entitlement to any proceeds, but there was no substantial risk of double recovery or inconsistent adjudications, in part because the trustee confirmed by letter that he would be satisfied with any recovery adjudged in favor of the debtor's successor. The mortgagees have made no such concession in the case at bar, and here, unlike

in *Smith*, there is an issue over whether sufficient funds will be available for payment of covered losses.  Also, here, unlike in *Smith*, the amount in dispute is more than enough to warrant separate litigation, thus posing a risk of inconsistent adjudications or double recovery.

In sum, the mortgagees are necessary parties under Rule 19(a).  That does not mean, however, that the mortgagees are indispensable—that is, that the action must be dismissed.  Under Rule 19(b), parties are indispensable only if they cannot be joined and the action cannot properly go forward in their absence.  Here the mortgagees can properly be joined, at least so far as this record reflects.

This is so notwithstanding Prime's assertion that one of the mortgagees, Hancock, is a Florida citizen and thus is not diverse from plaintiffs.  Prime says Hancock's joinder will destroy diversity jurisdiction.

This contention fails for two reasons.  First, at least for jurisdictional purposes, the mortgagees will properly be aligned with plaintiffs, not with defendants, because the mortgagees' interests are consistent with plaintiffs' and antagonistic to Prime's.  *See generally* 13B WRIGHT, MILLER, & COOPER, FEDERAL PRACTICE AND PROCEDURE, JURISDICTION 2D §3605 at 400 (1984).  Plaintiffs and mortgagees have a common interest in recovering the Waters Edge losses from the available RSUI coverage.  Indeed, plaintiffs and the mortgagees share exactly the

same interest in assuring that any recovery from the RSUI proceeds is at least sufficient to pay the mortgages.  Plaintiffs and the mortgagees apparently do not dispute their relative priority in any such proceeds; plaintiffs seem to concede, and the mortgagees surely would agree, that RSUI proceeds, to the extent available to plaintiffs or the mortgagees, should be paid first to the mortgagees, with any remaining balance paid to plaintiffs.  And while the mortgagees may not share plaintiffs' interest in securing proceeds over and above the amount due on the mortgages, the mortgagees have no reason to oppose such a recovery.  The mortgagees relationship with Prime, in contrast, is directly antagonistic.  Prime has explicitly opposed payment of the mortgagees from the RSUI proceeds now held in the Escrow Account on the ground that the available funds for payment of Waters Edge losses may be less than the amount owed on the mortgages.

Second, one of the methods by which the mortgagees apparently could be made parties to this action is through a statutory interpleader claim.  *See* 28 U.S.C. §1335.  Such a claim requires only minimal diversity and allows nationwide service of process.  Though RSUI has asserted no interpleader claim to date, it has deposited the remaining funds in dispute to the Escrow Account created pursuant to the parties' agreement.  As set forth in the next section of this order, RSUI will have to file an interpleader claim (or take other appropriate action) in order to

proceed on the course suggested by its deposit of these funds to the Escrow
Account.

For these reasons, the mortgagees are necessary parties who must be added
to this action.  The action will not be dismissed unless they are not joined.[4]

## VII
## Disbursement of Funds

The Escrow Account was created and funded with the proceeds of two
checks for Waters Edge losses pursuant to an express agreement of the parties.
More recently, RSUI made the unilateral decision to deposit additional funds to the
account in an effort to subject the funds to court control and to avoid double
liability—precisely the purposes of interpleader.  But RSUI has not filed an
interpleader claim.  RSUI's effort to short-circuit the pleading requirement, while
perhaps understandable, will not do.  Absent an agreement of the parties or a basis
for entry of an order requiring funds to be disbursed only with court approval, the
funds are not properly subject to court control.

Whether the adjuster or the mortgagees are entitled to payment of the full
amount of their claims turns on disputed issues of fact and law that cannot properly
be resolved on the pending motions.  The motions for disbursement of funds to the

_____

[4] Whether the adjuster Baldwin also should be joined is a different issue.  It
is clear, at least, that Baldwin properly *could be* joined.  Because no party has
asserted that Baldwin is a necessary party, I do not address the issue.

adjuster and the mortgagees thus will be denied.

Prime's motion to require RSUI to withdraw from the Escrow Account the additional deposits made without court approval is well founded as matters now stand, because there was no proper basis for deposit of those funds into the account in the first place.  That would change, however, upon the filing of an appropriate interpleader claim establishing a basis for holding those funds.  Prime's motion for withdrawal of the funds will be denied without prejudice to renewal if RSUI fails to file an interpleader claim within 21 days.  Withdrawal of the funds in the interim will not be authorized.

**VIII**
**Conclusion**

Whether the proceeds of RSUI's coverage are available for payment of all, or only a portion, of the losses to the Waters Edge apartment complex is a dispute of fact and law that cannot properly be resolved on the pending motions.  The mortgagees must be joined, but Prime's motion to dismiss is unfounded in all other respects.  No disbursement of funds from the Escrow Account is authorized at this time, and no disbursement will be authorized if RSUI files an interpleader claim within 21 days.  Accordingly,

IT IS ORDERED:

1. Defendant Prime Income Asset Management, Inc.'s motion to dismiss

(document 21) is DENIED.

2.  Defendant Prime Income Asset Management, Inc.'s motion for an evidentiary hearing on personal jurisdiction (document 39) is DENIED.

3.  Plaintiffs' motion for disbursement of funds to the mortgagees (document 51) is DENIED.

4.  Defendant Prime Income Asset Management, Inc.'s motion for withdrawal of funds (document 60) is DENIED.

5.  Defendant Prime Income Asset Management, Inc.'s motion for an evidentiary hearing on withdrawal of funds (document 67) is DENIED.

6.  Non-party The Baldwin Company, Inc.'s motion for disbursement of funds (document 82) is DENIED.

7.  Defendant Prime Income Asset Management, Inc.'s motion for judicial notice (document 64) is GRANTED.  Judicial notice is taken of the proceedings in Case No. 3-07CV0102-D, United States District Court, Northern District of Texas.

8.  Defendant Prime Income Asset Management, Inc.'s motion for direction regarding case schedule (document 88) is GRANTED.  The existing schedule remains in effect unless and until modified.  Plaintiffs are granted leave to amend to add additional parties within by April 23, 2007.  RSUI is granted leave to file a counterclaim for interpleader by April 23, 2007.  By separate notice, the clerk shall

set a scheduling conference for the first available date on the calendar of the court

and all attorneys on or after April 9, 2007.  The scheduling conference will be

conducted in person unless all parties request that the scheduling conference be

conducted only by telephone.  If conducted in person, attorneys may appear by

telephone, so long as at least one attorney for plaintiffs and one attorney for

defendant Prime Income Asset Management, Inc. appear in person.

SO ORDERED this 31st day of March, 2007.

s/Robert L. Hinkle
Chief United States District Judge